**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

KANDICE PULLEN                                    CIVIL ACTION NO. 5:14-cv-390

VERSUS                                                  JUDGE ELIZABETH ERNY FOOTE

CADDO PARISH SCHOOL BOARD               MAGISTRATE JUDGE HAYES

## MEMORANDUM RULING

Pending before the Court is Defendant Caddo Parish School Board's ("CPSB") motion for summary judgment.[1] For the reasons stated herein, the Defendant's motion for summary judgment shall be **GRANTED**.

## I.      Factual and Procedural Background

In February 2011, Plaintiff Kandice Pullen ("Pullen") began working as a temporary clerical employee in the purchasing department of CPSB under the supervision of Timothy Graham ("Graham").[2] Her assignment ended on June 30, 2011, and Pullen did not work in the purchasing department again until February 2012.[3] This second assignment ended sometime between mid-to-late May 2012, at which time she transferred to the human resources department of CPSB.[4] During her tenure in human resources, she was supervised

---

[1]Record Document 26.

[2]Record Document 26-3, p. 2.

[3]Id. at p. 3.

[4]Id.

by Cleveland White, and she worked there until the end of July 2012.[5] In late September or early October, Pullen began to work in the CPSB special education center as a substitute clerical employee.[6] She worked there until March 2013, when she left CPSB to focus on school.[7]

Pullen alleges that while she worked at CPSB, she was sexually harassed by Graham.[8] She states that during her first stint in the purchasing department Graham often made inappropriate comments about her physical appearance and asked her personal questions.[9] During her second stint in 2012 in the purchasing department, Pullen alleges that Graham's verbal harassment of her increased and that Graham touched her thigh on one occasion. She also avers that he would occasionally touch her arm or shoulder.[10] On one occasion, he invited her into his office to show her inappropriate pictures of women on his computer.[11]

After she left the purchasing department, Pullen states that Graham continued to stop by the personnel department to speak with her.[12] After Pullen transferred to the

---

[5]Id.

[6]Id.

[7]Id. at p. 4.

[8]Record Document 26-5, pp. 64-65.

[9]Id. at p. 66.

[10]Id. at pp. 72-73.

[11]Record Document 26-5, pp. 75-76.

[12]Id. at pp. 150-52.

special education center, Graham stopped harassing her. In the beginning of October 2012, Pullen met Graham for lunch and that was her last contact with him.[13]

On February 27, 2013, Aimee Harris ("Harris") filed a formal complaint with the CPSB against Graham for sexually harassing her.[14] Harris was a substitute clerical employee who worked in the purchasing department under Graham for one week before she sought out Annette Dunlap ("Dunlap"), the secretary to the Human Resources Director, and asked to be reassigned.[15] After Harris was reassigned to a different office, she alleged that Graham continued to harass her. It was at that point that she filed a formal complaint with Cleveland White ("White"), the director of human resources.[16] In her formal complaint, Harris named several CPSB employees whom she believed may have been subject to harassment by Graham, including Pullen.[17] White placed James Wolfolk ("Wolfolk") in charge of investigating Harris's complaint and preparing a written report.[18] Wolfolk interviewed Harris, Graham, Pullen, and the other employees named in Harris's complaint. Pullen was interviewed on March 4, 2013.[19] Wolfolk completed a written report of his

---

[13]Id. at 81-88.

[14]Record Document 26-8, pp. 19-20.

[15]Id. at p. 19.

[16]Id.

[17]Record Document 26-15, Ex. 20.

[18]Record Document 26-7, p. 15.

[19]Record Document 26-5, p. 98.

investigation and found that Graham had behaved unprofessionally and inappropriately.[20] Wolfolk concluded that Graham was in violation of the CPSB sexual harassment policy, and he recommended that Graham be placed on unpaid leave for one week. Wolfolk also recommended that Graham be required to attend counseling regarding his behavior.[21] Wolfolk presented his findings to the Superintendent of CPSB, who agreed with the findings and recommendations.[22]

On March 6, 2013, Pullen signed and dated a letter to the Equal Employment Opportunity Commission ("EEOC"), describing how Graham had harassed her.[23] The letter was received by the EEOC on March 12, 2013, and on March 18, 2013, an employee at the EEOC contacted Pullen to confirm that she wished to file a charge against CPSB.[24] Pullen signed the EEOC formal charge on April 23, 2013, and it was received by the EEOC on May 16, 2013.[25]

Pullen filed suit against CPSB in the First Judicial District Court, Caddo Parish, Louisiana on January 29, 2014, and the case was removed to this Court.[26] Pullen alleges violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII")

---

[20]Record Document 26-7, p. 55.

[21]Record Document 26-15, Ex. 31.

[22]Record Document 26-14, p. 45.

[23]Record Document 26-5, p. 45.

[24]Record Document 26-15, Ex. 83.

[25]Id. at Ex. 7.

[26]Record Document 1.

for sex discrimination and retaliation.[27] CPSB filed the instant motion for summary judgment, alleging there is no genuine issue of material fact on any of Pullen's Title VII claims.[28] Pullen filed a partial motion for summary judgment, which asks the Court to find that there is no genuine issue of material fact as to whether Graham was Pullen's supervisor, that he sexually harassed her, and that CPSB cannot prove its affirmative defense.[29]

## II.   Summary Judgment Standard

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id.

---

[27]Id. Plaintiff originally alleged quid pro quo and retaliation claims under Title VII, but conceded those claims in her opposition to CPSB's motion for summary judgment. Record Document 31.

[28]Record Document 26.

[29]Record Document 27.

If the party moving for summary judgment fails to satisfy its initial burden of demonstrating the absence of a genuine issue of material fact, the motion must be denied, regardless of the nonmovant's response.  <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  If the motion is properly made, however, Rule 56(c) requires the nonmovant to go "beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial."  <u>Wallace v. Texas Tech. Univ.</u>, 80 F.3d 1042, 1047 (5th Cir. 1996) (citations omitted).  While the nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence, <u>Little</u>, 37 F.3d at 1075, <u>Wallace</u>, 80 F.3d at 1047, all factual controversies must be resolved in favor of the nonmovant.  <u>Cooper Tire & Rubber Co. v. Farese</u>, 423 F.3d 446, 456 (5th Cir. 2005).

## III.   Law and Analysis

Under Title VII, an employer's liability for harassment may depend on the status of the harasser. <u>Vance v. Ball State Univ.</u>, 133 S. Ct. 2432, 2439 (2013). If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. If the harasser is a supervisor of the victim, meaning he is empowered to take tangible employment actions against the victim, then the standard for liability is strict liability. <u>Id.</u> Under this standard, if the supervisor's harassment culminates in a tangible employment action, then strict liability applies to the employer. However, if there is no tangible employment action, then the employer can avail itself of the <u>Ellerth/Faragher</u> affirmative defense. <u>Id.</u>  Pullen has conceded that she suffered no

"tangible employment action." Record Document 31. Pullen's claims arise out of an alleged hostile work environment. Therefore, as is discussed in more detail below, if the harasser is her supervisor, the Ellerth/Faragher affirmative defense would be available to the CPSB.

CPSB alleges in its motion for summary judgment that Pullen's hostile work environment claims must be divided and analyzed under two different time periods. The parties agree that for the first time period, Graham was Pullen's supervisor because he had the ability to take tangible employment actions against her while she worked as a temporary clerical employee in the purchasing department.  However, in May 2012 when Pullen was transferred to the human resources department, and later to the special education center, Graham was no longer her supervisor. Could he have still have taken tangible employment actions against Pullen and therefore qualified as a "supervisor" for purposes of vicarious liability under Title VII? Pullen's response to Defendant's motion raises no dispute of material fact on this issue.[30] Therefore, this Court concludes that during this second time period, Graham, for the purposes of Title VII, is considered her co-worker because he could no longer take tangible employment actions against her.

The Court agrees with CPSB that Pullen's hostile work environment claims must be divided into two separate claims, based upon the two different time periods that she

_____

[30] Pullen's only statement on this issue is: "Graham used his authority to move about the Central Office to pursue Pullen and sexually harass her. No simple co-worker could do that." Record Document 31. This conclusory statement is insufficient to defeat the undisputed fact that as of the time of Pullen's transfer out of Graham's department he was no longer her supervisor both in name and within the meaning of Title VII. Pullen points to no fact which suggests that after the transfer Graham had any ability to take tangible employment actions against her.

Page 7

worked at CPSB. Under the first hostile work environment claim, Graham was her supervisor for the purposes of Title VII and CPSB is subject to a strict liability standard. Under her second hostile work environment claim, CPSB shall be subject to a negligence standard of liability because Graham was her co-worker when she worked outside of the purchasing department. Each of the above claims will be addressed below.

### A.     Pullen's First Hostile Work Environment Claim

The parties agree that Pullen did not suffer a tangible employment action while she worked in the purchasing department. Therefore, CPSB can avoid liability if it can show that it satisfies the Ellerth/Faragher affirmative defense. As a preliminary matter, CPSB argues that Pullen's first hostile work environment claim should be dismissed because it is untimely under the EEOC regulations. In the alternative, it argues that it satisfies the Ellerth/Faragher affirmative defense. The Court will address each of these arguments below.

### 1.     Timeliness of EEOC Charge of Discrimination

In an employment discrimination case, a plaintiff must exhaust all of his administrative remedies before he can file suit in federal court. Taylor v. Books A Million, Inc., 296 F.3d 376, 379 (5th Cir. 2002). Specifically, to maintain a Title VII action, an employee must first file a charge of discrimination with EEOC within 300 days of the alleged unlawful employment practice and receive the statutory notice of right to sue. 42 U.S.C. § 2000e-5(e)-(f)(1); Price v. Sw. Bell Tel. Co., 687 F.2d 74, 77 (5th Cir. 1982). A charge of discrimination must "be in writing under oath or affirmation and shall contain

such information and be in such form as the Commission requires." 42 U.S.C. § 2000e-5(b). The EEOC's regulations require that a charge of discrimination be in writing, signed and verified. 29 C.F.R. §§ 1601.9, 1601.3(a). A sufficient charge should contain "[t]he full name and address of the person against whom the charge is made" and "[a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices." Id. at § 1601.12(b). A charge is filed with the EEOC upon the agency's receipt of the charge. Id. at § 1601.13(a)(1).

In the present case, CPSB argues that Pullen's first hostile work environment claim is untimely because she did not submit a charge to the EEOC until after her 300 day time limit was expired.[31] Pullen argues that her charge was received by the EEOC within the 300 day time limit, and therefore, her first claim is timely.[32] The parties disagree as to the date that the running of the 300 day time period should begin. It is undisputed that Pullen dated and mailed a letter to the EEOC on March 6, 2013.[33] The EEOC received the letter on March 12, 2013 and called Pullen on March 18, 2013 to confirm that she wished to issue a charge.[34] CPSB contends that a charge was not filed with the EEOC until March 18, 2013, when Pullen verbally confirmed that she wished to file a charge.[35] Pullen argues that her

---

[31]Record Document 26-3, p. 8. CPSB admits that Pullen's second hostile work environment claim is timely.

[32]Record Document 31, pp. 11-12.

[33]Record Document 31, p. 5 and Record Document 26-3, p. 9.

[34]Id.

[35]Record Document 26-3, p. 9.

letter, dated March 6, 2013, is sufficient to constitute a charge and that her 300 day time limit should start from that date.[36] The Court must first determine which of the above dates constitutes the beginning of 300 day time period before it can ascertain whether Pullen's EEOC charge was timely.

The Fifth Circuit has held that, in general, employment charges are construed with "the utmost liberality" because they are often prepared by laymen. Price, 687 F.3d at 77. The Court finds illustrative the Fifth Circuit's findings with regards to intake questionnaires as charges. In Conner v. Louisiana Department of Health and Hospitals, the Fifth Circuit stated that it "has recognized that an intake questionnaire that informs the EEOC of the identity of the parties and describes the alleged discriminatory conduct in enough detail to enable the EEOC to issue an official notice of charge to the respondent is sufficient to set the administrative machinery in motion." 247 F. App'x 480, 481 (5th Cir. 2007). In that case, the court held that where the plaintiff did not file her verified charge until after the 180 day deadline, her intake questionnaire was sufficient to substitute for her verified charge. Id.

This Court finds that Pullen's letter to the EEOC was sufficient to constitute a charge against the CPSB because it included Pullen's name, her employer's name, and a detailed description of the alleged harassment. Pullen signed and dated the letter, and then sent it to the EEOC. Considering the liberality afforded to laymen, Pullen's letter provided the EEOC with sufficient information to set the administrative machinery in motion. Under

---

[36]Record Document 31, p. 5.

EEOC regulations, a charge is considered filed on the date that the EEOC receives it. Therefore, the Court finds that Pullen filed her charge with the EEOC on March 12, 2013, the date the EEOC received her letter, and thus, her charge is timely under the 300 day time limit if Graham's harassment occurred on May 16, 2012 or later.

In addition to disputing the date the EEOC charge was filed, the parties also disagree on the date that Pullen was last harassed in the purchasing department by Graham. It is undisputed that Shari Foreman ("Foreman") started work in the purchasing department on May 14, 2012 as a permanent replacement for Pullen. Forman testified that she never worked with Pullen and that she believes Pullen did not work in the purchasing department after May 12, 2012.[37]  Pullen contends that she continued to work in the purchasing department after Foreman's start date in order to train her and estimates that she worked in the purchasing department until mid-to-late May.[38]

 Pullen does not argue with any specificity that she was harassed during her last two weeks of work in the purchasing department. However, in her deposition, Pullen testified that during the time period that she worked for Graham, he sexually harassed her "several times a week."[39] Although not argued by Pullen, the evidence indicates that there is a possibility that Pullen was sexually harassed during the end of her tenure in the CPSB purchasing department.

---

[37]Record Document 26-11, pp. 14-17.

[38]Record Document 26-5, pp. 26-27.

[39]Id. at p. 69.

Page 11

Considering the above conflicting evidence, the Court finds that there is a question of material fact as to the last date of Pullen's employment in the purchasing department and her harassment by Graham. This question of fact is determinative to whether her EEOC charge as to the her first hostile work environment claim is timely. Therefore, the Court finds that CPSB's motion for summary judgment insofar as it relates to a question of the timeliness of Pullen's EEOC charge is **DENIED**.

### 2.    Liability under the _Ellerth/Faragher_ Defense

However, CPSB also argues that, in the alternative, Pullen's first hostile work environment claim must fail because it is immune from liability under the _Ellerth/Faragher_ affirmative defense.[40] Under this defense, an employer will not be vicariously liable for harassment by a supervisor if it can show: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." _Faragher v. City of Boca Raton_, 524 U.S. 775, 807, 118 S. Ct. 2275 (1998). The employer bears the burden of proving both elements by a preponderance of the evidence. _EEOC v. Boh Bros. Const. Co._, 731 F.3d 444, 462 (5th Cir. 2013)(citations omitted). Each of the above elements will be addressed in turn.

### a.    Employer's reasonable care to prevent and correct promptly any sexually harassing behavior

---

[40]Record Document 26-3, p. 13.

"An employer can satisfy the first prong of the Ellerth/Faragher defense by implementing suitable institutional policies and educational programs regarding sexual harassment." Boh Bros. Constr., 731 F.3d at 462-63. The Supreme Court in Burlington Indusustries, Inc. v. Ellerth stated that it is unnecessary, as a matter of law, that an employer promulgate an anti-harassment policy with a complaint procedure in every instance. 524 U.S. 742, 765, 118 S. Ct. 2257, 2270 (1998). However, "the existence of a written complaint procedure [is] an important variable in the Ellerth/Faragher analysis." Boh Bros. Constr., 731 F.3d at 464.

Considering this, the Fifth Circuit in Boh Brothers Construction analyzed the employer's policies and programs to determine whether it had taken reasonable measures to prevent discriminatory behavior. 731 F.3d at 463. The court stated that "[n]ot every policy eliminates liability; generic policies that offer no specific complaint procedure may be insufficient to satisfy the Ellerth/Faragher defense." Id. The court found that the company's broad nondiscriminatory policy was not sufficient to satisfy the first element of the defense because it offered no specific guidance regarding sexual harassment, offered no specific instructions to employees on how to assert or investigate harassment complaints, and the company did little to implement its nondiscrimination policies. Id. at 464-65. The company's investigation of the alleged sexual harasser consisted of a belated and cursory twenty minute investigation, during which the investigating employee took no notes and asked no questions. Finally, the court noted that the company failed to punish the perpetrator of the sexual harassment. Id. at 466.  The court found that "[h]ad Boh

Page 13

Brothers adopted suitable institutional policies and educational programs regarding sexual harassment, it may have avoided liability." Id.

Here, CPSB argues that it has satisfied the first element of the defense because it has a detailed sexual harassment policy that encourages and facilitates employee complaints and that the company swiftly and effectively deals with employee complaints made under the policy.[41] CPSB notes that it posted copies of the sexual harassment policy on bulletin boards in areas in which Pullen worked; the entire policy was available on the CPSB website; and it was published in the official public minutes of the school board meeting that approved the policy; and it was published in the CPSB's official journal.

Pullen contends that CPSB cannot satisfy the first element of the defense because Pullen, in addition to other CPSB employees who worked at the central office, did not receive a copy of or any education on the sexual harassment policy.[42] Pullen urges the Court to find that CPSB's posting of the policy online and on bulletin boards is insufficient.[43]

In the present case, the Court must note primarily that CPSB has a specific sexual harassment policy.[44] The CPSB sexual harassment policy is eight pages long and includes definitions of sexual harassment and several pages of information about reporting procedures.[45] It is undisputed that the policy was posted on bulletin boards in the central

---

[41]Record Document 26-3, p. 14.

[42]Record Document 31, p. 13 and Record Document 27-1, p. 2.

[43]Record Document 31, pp. 17-18.

[44]Record Document 26-15, Ex. 4.

[45]Id.

Page 14

office, on the CPSB website, and as a part of the public minutes of the CPSB meeting that ratified the document. CPSB also notes for the Court that it has almost 6,000 employees and that the majority of those employees attend educational programs that discuss the sexual harassment policy.[46]

CPSB is correct in its assertion that the Ellerth/Faragher defense does not require that every employee in a company be trained on the company's sexual harassment policy. The Ellerth/Faragher defense requires that a company take reasonable care to prevent and correct promptly any sexually harassing behavior. Although Pullen has provided testimony and evidence that she and certain other employees at the central office were not educated about the sexual harassment policy, there is evidence that a detailed policy existed and was easily accessible to Pullen and other employees. Although Graham testified that he had never seen the CPSB sexual harassment policy prior to being disciplined by the school board, he did admit in his deposition that all directors, including himself, "were required to take training classes, becoming a better manager, documentation, harassment in the workplace, things of that nature."[47] In the two years that he was a supervisor with CPSB, Graham states that he attended "from eight to ten classes" that discussed harassment in the workplace.[48]

---

[46]Record Document 26-3, p. 16.

[47]Record Document 26-12, p. 41.

[48]Id.

There is also evidence that CPSB promptly corrected Graham's sexually harassing behavior once Harris filed a complaint against him. It is undisputed that CPSB promptly instigated a formal investigation under the policy once it received Harris's complaint. That investigation, conducted by Woolfolk, included interviews with Graham, Pullen, Harris and others.[49] He prepared a written report that was forwarded to the Superintendent, Assistant Superintendent and the personnel director, who then placed Graham on unpaid leave for one week. Graham was also required to attend sexual harassment training classes.[50]

Although Pullen urges the Court to find parallels between the present case and Boh Brothers Construction, there are distinct differences between the two cases. As noted by CPSB in its opposition, the company in Boh Brothers Construction had a broad, generic anti-discrimination policy with no specific guidance as to sexual harassment, the employer did little to implement the policy, and the plaintiff's complaint in that case received only a 20 minute long investigation. 731 F.3d at 467-68. It is clear that CPSB had a much more detailed sexual harassment policy; provided employees access to that policy; trained many of its employees, including Graham, on the policy; and effectively implemented that policy upon the receipt of a sexual harassment complaint. Although Pullen has provided evidence that she and other employees at the central office of the CPSB did not receive a copy or training on the CPSB sexual harassment policy, this fact alone is not sufficient to create a question of fact as to the reasonable care taken by CPSB to prevent and correct any

---

[49]Record Document 26-3, p. 16.

[50]Id.

sexually harassing behavior. Therefore, the Court finds that CPSB has satisfied the first element of the <u>Ellerth/Faragher</u> affirmative defense.

> **b.     Plaintiff Employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise**

The Court in <u>Faragher</u> stated that an employee must "avoid harm otherwise," meaning that "if damages could reasonably have been mitigated, no award against a liable employer should reward a plaintiff for what her own efforts could have avoided." 524 U.S. at 807, 118 S. Ct. at 2292. The Fifth Circuit has stated that "<u>Faragher</u> implies that a plaintff should not wait as long as it usually takes for a sexually hostile working environment to develop when the company has an effective grievance mechanism. If the plaintiff complains promptly, the then-incidental misbehavior can be stymied before it erupts into a hostile environment, and no actionable Title VII violation will have occurred." <u>Indest v. Freeman Decorating, Inc.</u>, 164 F.3d 258, 267 (5th Cir. 1999). The Supreme Court has explicitly stated that the "primary objective" of Title VII is "not to provide redress, but to avoid harm." <u>Faragher</u>, 524 U.S. at 806, 118 S. Ct. at 2292 (citations omitted).

Here, CPSB argues that Pullen unreasonably failed to take adequate and appropriate advantage of any preventative or corrective opportunities provided by CPSB.[51] CPSB contrasts Pullen's actions to those of Harris, who reported Graham's sexually harassing behavior after only a week in his department.[52] Harris was transferred to a different

---

[51] Record Document 26-3, p. 14.

[52] <u>Id.</u>

Page 17

department, and a formal investigation into Graham's behavior was undertaken by CPSB.[53]

Graham ultimately was suspended from work without pay and required to attend

counseling sessions.[54] Pullen argues that she should be excused from "any legal duty to

take advantage of her employer's preventative and corrective measures" because she was

unaware of CPSB's sexual harassment policy.[55] Pullen has not cited any case law

supporting this argument.

Pullen also argues that "the harassment was sudden and unanticipated" when

Graham touched her thigh, and therefore, there is nothing Pullen could have done to avoid

harm otherwise.[56] Pullen argues that "the rules are different when there is sudden sexual

harassment."[57] She cites to Walton v. Johnson & Johnson Serv., Inc., 347 F.3d 1272, 1291-

92 (11th Cir. 2003), which does not address the issue; Greene v. Dalton, 164 F.3d 671,

675 (D.C. Cir. 1999), wherein the court found that summary judgment on the affirmative

defense was inappropriate where the supervisor raped the employee and there was an

absence of evidence that a reasonable person in the victim's place would have come

forward early enough to prevent the harassment from becoming severe or pervasive; and

Indest, 168 F.3d at 804, wherein Judge Weiner stated in a concurrence that "[i]t is, of

course, theoretically possible for a supervisor to engage in sufficiently severe conduct (e.g.

---

[53]Id.

[54]Id.

[55]Record Document 27-1, pp. 15-16.

[56]Id. at pp. 20-21.

[57]Id.

raping, 'flashing,' or forcibly groping or disrobing the subordinate employee) in such a short period of time that, even though (1) the employee reports the conduct immediately, (2) the employer takes swift and decisive remedial action, and (3) no tangible employment action ensues, the employer could still be held vicariously liable under the Ellerth/Faragher 'severe or pervasive' test."

The Court does not believe that the facts of this case implicate "sudden sexual harassment," as Pullen argues. Although Pullen alleges that Graham touched her thigh one time, that instance of unwanted touching is but a small part of a pattern of misbehavior allegedly perpetrated by Graham. The cases cited by Pullen do not support her theory that the facts of this case lend themselves to "sudden sexual harassment." Additionally, even if those cases did support her sudden sexual harassment theory, the Court would still need to engage in an analysis under Ellerth/Faragher to determine whether the time period between the sexual harassment and her report of the misbehavior to CPSB was reasonable.

The Fifth Circuit has addressed the issue of reasonable delay in the context of the second prong of the Ellerth/Faragher affirmative defense on several occasions. In Watts v. Kroger Co., the Fifth Circuit found that an employee's two or three month delay in reporting her harassment was not unreasonable as a matter of law. 170 F.3d 505, 510 (5th Cir. 1999). In Casiano v. AT&T Corp., the Fifth Circuit held that an employee's actions were unreasonable when he allowed five months to pass between the first instance of alleged harassment and the filing of his formal complaint. 213 F.3d 278, 281 (5th Cir. 2000). In

Wyatt v. Hunt Plywood Co., Inc., an employee complained about her supervisor's conduct to her supervisor's supervisor but her complaint was met with more harassment. 297 F.3d 405, 407 (5th Cir. 2002). The court stated that this initial complaint was reasonable but held that when the plaintiff waited an additional six months to report the supervisors to someone else, this second delay in reporting was unreasonable. Id.  Finally, in Lauderdale v. Texas Dept. of Criminal Justice, 512 F.3d 157, 165 (5th Cir. 2007), an employee was first harassed in July 2004 and reported that harassment to her immediate supervisor that same day. Although her immediate supervisor did nothing to prevent further harassment by the other supervisor, the court held that it was unreasonable for the employee to wait an additional five months, until the day she turned in her resignation, to report the continued harassment to the employer. Id. The court additionally noted that "[f]iling a complaint upon, or after, resigning does not mitigate any of the damage, because it does not allow the employer to remediate the situation." Id.

In the present case, Pullen alleges that Graham began harassing her in February 2011 and stopped harassing her on October 1 or 2, 2012.[58] Pullen testified that the first time she spoke to someone in management about Graham's harassment was on March 4, 2013 when she spoke to Wolfolk during the course of the Harris investigation.[59] Pullen resigned from the CPSB in March, 2013.[60]

_____

[58]Record Document 26-5, pp. 50-51.

[59]Id. at p. 52.

[60]Id. at p. 32.

The Fifth Circuit has not enumerated an exact timeline upon which to evaluate the reasonableness of an employee's delay in reporting sexual harassment. However, the court's holdings in <u>Watts</u>, <u>Casiano</u>, <u>Wyatt</u> and <u>Lauderdale</u> do suggest that the reasonableness of an employee's delay in reporting sexual harassment is more suspect after two or three months. <u>See</u> <u>Wyatt</u>, 297 F.3d at 407 (discussing three distinct time periods). Additionally, this Court must consider the language in <u>Lauderdale</u>, in which the Fifth Circuit stated that filing a complaint on the same day as a resignation "is no longer a saving action contemplated and encouraged by Title VII … hence it is not sufficient to defeat the <u>Ellerth/Faragher</u> affirmative defense." 512 F.3d at 165.

Pullen never formally filed a complaint with CPSB, and the first time she spoke to anyone in management about Graham's alleged harassment was on March 4, 2013, more than two years after she claims that she was first harassed. Additionally, Pullen spoke to Wolfolk within days of her resignation from CPSB. As described above, the Supreme Court has found that the objective of Title VII is to avoid harm, not to provide redress. Pullen alleges that she was harassed on a near weekly basis while she worked for Graham but failed to report even one instance of this harassment to any other supervisor within CPSB. Although she may not have been aware of the CPSB sexual harassment policy, it is very detailed and has instructions for supervisors to take once they receive a report of harassment. Pullen could have notified a CPSB supervisor to help mitigate her harm.  The Court finds it is unreasonable that Pullen waited over two years to report any instances of Graham's wrongdoing to CPSB. Therefore, the Court finds that CPSB has satisfied its

burden on both prongs of the <u>Ellerth/Faragher</u> affirmative defense. The Court **GRANTS** CPSB's motion for summary judgment on the first hostile work environment claim.

### B.    Pullen's Second Hostile Work Environment Claim

Pullen's second harassment claim is properly analyzed under the standards for a hostile work environment because during that time Graham was no longer her supervisor. "A hostile work environment claim consists of five elements: (1) membership in a protected group; (2) unwelcome sexual harassment; (3) harassment complained of is based upon sex; (4) harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action." <u>Hague v. Univ. of Texas Health Sci. Ctr. at San Antonio</u>, 560 F. App'x 328, 332 (5th Cir. 2014)(citing <u>Woods v. Delta Beverage Grp., Inc.</u>, 274 F.3d 295, 298 (5th Cir. 2001)). CPSB argues that Pullen will be unable to satisfy the fifth and final element described above because it had no actual or constructive notice of her harassment.[61] Pullen contends that CPSB is negligent because it did not distribute or educate the employees in the central office, including herself, about its sexual harassment policy.[62]

An employer can be liable for sexual harassment if it "knew or should have known of the harassment in question and failed to take prompt remedial action." <u>Williamson v. City of Houston, Texas</u>, 148 F.3d 462, 464 (5th Cir. 1998). A Title VII employer has actual

---

[61]Record Document 26-3, pp. 12-13.

[62]Record Document 27-1, pp. 14-15.

knowledge of harassment when the harassment is known to "higher management" or to someone who has the power to remedy the problem. Sharp v. City of Houston, 164 F.3d 923, 929 (5th Cir. 1999)(citations omitted). For an employee to qualify as "management," a person must have the ability to exert control over employees. Id. In other words, an employee is a manager when he has the power to hire, fire or take disciplinary action against the harassing employee, to provide significant input into employment decisions, to instruct the offending employee to cease the harassing behavior, or to implement other means of taking remedial action. Id. (citations omitted). The Fifth Circuit has found that "the key to whose knowledge may be imputed to the employer is remedial power: There is no actual knowledge until someone 'with authority to address the problem' is notified." Id. at 930 (citations omitted).

Under this standard, CPSB did not have actual notice of Graham's alleged harassment of Pullen. Pullen admits that she did not report the harassment to anyone at CPSB until her meeting with Wolfolk on March 4, 2013.[63] Pullen states that she told Annette Dunlap, William Farmer, and Ebonie Nelson that Graham made her uncomfortable.[64] None of these people are "managers" for Title VII purposes, meaning none of them had remedial power over Graham.[65] Because nobody with remedial power over Graham knew of the

---

[63]Record Document 26-5, p. 147 and pp. 97-98.

[64]Id. at pp. 96-97. Pullen notes that she did not detail Graham's harassment to these people. She simply told them that he made her uncomfortable and she did not like working for him.

[65]Ebonie Nelson worked as a temporary employee in Human Resources from January 2011 until March 2011, at which time she became a permanent employee in

harassment, as a matter of law CPSB had no actual knowledge of it. See Sharp, 164 F.3d at 930.

CPSB may also be liable if it had constructive knowledge of Graham's harassment of Pullen. "If the harassment complained of is so open and pervasive that the employer should have known of it, had it but opened its eyes, it is unreasonable not to have done so, and there is constructive notice." Sharp, 164 F.2d at 930. Evidence of an effective anti-harassment policy may be relevant in determining whether an employer should have known about the hostile environment. However, an employer is not necessarily insulated from liability just because there is a grievance procedure, even if the victim has failed to utilize it. Id. In Sharp, the Fifth Circuit clarified that:

> To impute constructive knowledge to the employer, we must find constructive knowledge on the part of someone whose actual knowledge also would impute knowledge to the employer. This means a corporate enterprise 'knew or should have known' something only when the appropriate persons within that enterprise 'knew or should have known.' In the context of sexual harassment, such persons are those with remedial power over the harasser.

164 F.3d at 930. The court summarized that the question is whether someone who is a supervisor of the harasser knew or should have known that he was harassing one of his employees. Id.

As described above, Pullen notified several people that Graham made her uncomfortable and that she did not like working for him. However, none of those people had remedial power over Graham. All of the incidents of harassment detailed by Pullen in

---

development. Annette Dunlap was the secretary to the Human Resources Director for classified employees. William Farmer is Pullen's fiancee and it does not appear that he ever worked for CPSB. Record Document 31, p. 13.

her testimony take place behind closed doors, most often in Graham's office.[66] These incidents of harassment are similar to those in the <u>Sharp</u> case, wherein the court noted the harassment was made up of discrete incidents that were "physically and temporally isolated from those with powers to remediate." 164 F.3d at 930.

The plaintiff in <u>Sharp</u> made the same argument that Pullen makes in the present case: that there was no real way for her to escape the situation and no viable means of reporting or addressing the harassment she endured. <u>Id.</u> at 931. The court in <u>Sharp</u> stated that the employer must satisfy its duty of reasonable care by providing evidence that the harassed employee could have reported the harassment and escaped the harassing situation. <u>Id.</u> In that case, the harassed employee was a police officer who was being harassed by her superior officer. The city's harassment policy stated that she should have reported the harassment to her superior's superior or the Director of Affirmative Action, and the city argued that it could not have known of the harassment because the harassed officer did not report the harassment to either of the officials set out in the policy. <u>Id.</u> The court found that a jury reasonably could have found that the city should have known of the harassment, through the exercise of reasonable care, even though the officer never reported it, because she presented evidence that the code of silence effectively forbade her from lodging a complaint and that the affirmative action bypass was ineffective. <u>Id.</u> at pp. 931-32.

_____

[66]Record Document 26-5.

Page 25

Pullen argues that she was unaware of the CPSB policy and could not have reported her harassment due to the negligence of CPSB. The CPSB policy states that a harassed employee should report the harassment to her supervisor or, if her supervisor is the harasser, she can report the harassment to her supervisor's supervisor or the appropriate Director of Personnel.[67] In an attempt to analogize her case to <u>Sharp</u>, Pullen tesified that she did not want to report the harassment because she did not want to "cause any drama" while she was working at the school board office.[68]

However, the Court finds that the facts of this case differ from those in the <u>Sharp</u> case. Here, the record indicates that Harris, who was also a temporary employee and received no training on the sexual harassment policy, successfully filed a complaint against Graham after her first week at work.[69] Harris initially complained to Dunlap and successfully requested to be moved to another department. When Graham continued his harassing behavior, she filed a formal complaint against him.[70] CPSB promptly conducted a formal investigation, including the interview of several people who complained of sexual harassment from Graham, and ultimately suspended Graham without pay.

The Court finds the argument that CPSB was negligent because it did not train central office employees on the sexual harassment policy to be unpersuasive. There is no

---

[67]Record Document 26-15, p. 4.

[68]Record Document 26-5, p. 97.

[69]Record Document 26-8, pp. 19-20.

[70]<u>Id.</u> at p. 23.

Page 26

evidence in the record that management of CPSB should have known of the harassment she suffered. Pullen's argument that CPSB did not take reasonable care to know of harassment occurring in its company because it did not disseminate or train central office employees about the sexual harassment policy is substantially diminished because the record shows that a woman working as a substitute employee in Graham's department, who had no prior knowledge of the sexual harassment policy, successfully had herself transferred out of his department and filed a formal complaint about his behavior. Unlike the plaintiff employee in <u>Sharp</u>, who had no practical way to maintain her job and report on her harassment, Pullen could have followed the guidelines set out in the policy or she could have reported Graham's behavior to Dunlap, as Harris did.  The evidence indicates that once notified of his behavior, CPSB would have conducted a prompt investigation of her complaints. Considering the above, the Court finds that CPSB did not have constructive knowledge of Graham's harassment of Pullen.

As the Court finds that CPSB did not have actual or constructive knowledge of Graham's alleged sexual harassment of Pullen, Pullen cannot satisfy the fifth element of the negligence test. Therefore, CPSB's motion for summary judgment on Pullen's second hostile work environment claim is **GRANTED**.

## IV.   Conclusion

For the reasons given above, the Court rules that CPSB's Motion for Summary Judgment [Record Document 26] is **GRANTED**.

**IT IS ORDERED** that all claims by the Plaintiff against the Defendant are **DISMISSED WITH PREJUDICE**.

A judgment consistent with the instant memorandum ruling shall issue herewith.

**THUS DONE AND SIGNED** on this 2nd day of July, 2015.


ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE